**2025 IL 130110**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 130110)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
OCHEIL D. KEYS, Appellant.

*Opinion filed September 18, 2025.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a July 2021 trial, a jury found defendant, Ocheil D. Keys, guilty of first degree murder where, during the commission of the offense of first degree murder, he personally discharged a firearm that proximately caused the death of Barbara Rose (720 ILCS 5/9-1(a)(1) (West 2016)) and concealment of a homicidal death (*id.* § 9-3.4(a)) in Vermilion County case No. 17-CF-725. Additionally, the

jury found defendant guilty of dismembering a human body (*id.* § 12-20.5(a)) and concealment of a homicidal death (*id.* § 9-3.4(a)) in Vermilion County case No. 19-CF-732 and dismembering a human body (*id.* § 12-20.5(a)) and concealment of a homicidal death (*id.* § 9-3.4(a)) in Vermilion County case No. 19-CF-733. The trial court sentenced defendant to consecutive sentences of 60 years in prison for first degree murder, 15 years in prison for each dismemberment conviction, and 2 years in prison for each concealment conviction. After the cases were consolidated on appeal, the appellate court affirmed defendant's convictions and sentence. 2023 IL App (4th) 210630, ¶ 1.

¶ 2        In this appeal, defendant argues his trial counsel was ineffective for failing to (1) seek suppression of a portion of defendant's second video-recorded police interview following the invocation of his right to silence, (2) seek to redact inadmissible statements made by police and suggestions of other crimes made by defendant during the video-recorded interviews, and (3) request a limiting instruction concerning the inadmissible statements. Additionally, defendant argues this court should vacate one of his dismemberment convictions and two of his concealment convictions because neither the dismemberment nor the concealment statutes authorize more than one conviction for acts taken to dismember the same body or to conceal the same homicide. For the following reasons, we affirm in part, reverse in part, and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4        The appellate court provided a comprehensive account of the facts in this case. We repeat only those facts relevant to the issues before us. The evidence in this case established that, in October 2017, defendant was in a romantic relationship with the victim, Barbara Rose, and lived with Rose and her two daughters, ages 18 and 8, in Danville, Illinois. On October 24, 2017, Rose's two adult sons, Trent and Trai, went to Rose's house, where defendant informed them that he had not seen Rose in two days. Trent subsequently reported Rose missing to the police.

¶ 5                                A. Charges

¶ 6                    1. *Vermilion County Case No. 17-CF-725*

¶ 7        On October 31, 2017, the State charged defendant by information with six counts of first degree murder (alleging various theories of murder and that defendant personally discharged the firearm that caused Rose's death) (720 ILCS 5/9-1(a)(1), (2) (West 2016)) and concealment of a homicidal death where on or about October 22, 2017, defendant, with knowledge that Rose had died by homicidal means, knowingly concealed the death of Rose by transporting her body from the place of her death and hid or otherwise disposed of her remains (*id.* § 9-3.4(a)).

¶ 8                    2. *Vermilion County Case No. 19-CF-732*

¶ 9        On December 20, 2019, a Vermilion County grand jury indicted defendant on one count of dismembering a human body on or about October 23 to 26, 2017, in that defendant knowingly mutilated the deceased body of Rose by use of fire (*id.* § 12-20.5(a)), and one count of concealment of a homicidal death where on or about October 23 to 26, 2017, defendant knowingly concealed the death of Rose by moving her body to the property near 1519 Lyons Street, Danville, Illinois, with knowledge that Rose died by homicidal means (*id.* § 9-3.4(a)).

¶ 10                    3. *Vermilion County Case No. 19-CF-733*

¶ 11        On December 20, 2019, a Vermilion County grand jury also indicted defendant on one count of dismembering a human body on or about October 27 to 29, 2017, in that defendant knowingly dismembered, severed, and separated body parts from the deceased body of Rose (*id.* § 12-20.5(a)) and one count of concealment of a homicidal death where on or about October 27 to 29, 2017, defendant knowingly concealed the death of Rose by placing her body parts in a sock and bag and placed them into a 2000 Pontiac Grand Prix, with knowledge that Rose had died by homicidal means (*id.* § 9-3.4(a)).

¶ 12        On the State's motion, the 2017 and 2019 charges were tried together. During defendant's July 2021 jury trial, the following evidence was presented.

¶ 13                                B. Defendant's Jury Trial

¶ 14        Around 11 p.m. on Saturday, October 21, 2017, Rose and her friend, Jennifer Veatch, made plans via text message to meet up the next day to celebrate Veatch's birthday. Veatch testified that Rose said nothing about going to Indiana to buy a car. The next day, on Sunday, October 22, 2017, Veatch texted Rose around noon, but Rose never responded.

¶ 15        Ebbonie Bryant testified that she saw Rose on October 22, 2017, around 3 a.m. when she dropped her three-month-old daughter off at Rose's house for Rose to babysit while Bryant went out. When Bryant dropped her daughter off at Rose's house, she handed her to Rose while defendant stood in the doorway. Bryant testified that defendant messaged her via Facebook around 11 a.m. on October 22, 2017, and asked her to come pick up her baby. Bryant thought that was odd because Rose regularly babysat Bryant's children and never left them alone with defendant. In response to defendant's message, Bryant asked her friend Brytney Harrier to pick up her daughter from Rose's house. Harrier agreed to pick up Bryant's daughter, and she arrived at Rose's house around 11:30 a.m. on October 22, 2017. Harrier testified that, upon arriving at Rose's house, she walked up to the door and knocked, and defendant opened the door and handed her the baby and the diaper bag through the cracked door. Defendant did not welcome Harrier into the house, warning they had a vicious dog. Harrier testified she was familiar with Rose's dog and never knew it to be vicious.

¶ 16        Rhonda Crippin testified she was defendant's girlfriend in October 2017. Crippin did not know Rose and only became aware of defendant's relationship with Rose after her disappearance. Crippin testified that defendant came to her house between 11:30 p.m. on Sunday, October 22, 2017, and 1 a.m. on Monday, October 23, 2017. Crippin stated that defendant "acted normal" and spent most of the following week at her house, except for one night. On the night defendant did not stay at Crippin's house, he asked her for a lighter. Crippin testified she asked defendant why he needed a lighter because he did not smoke, and he said that his friend was in the car and needed it. Crippin also testified that initially defendant

- 4 -

drove a white Kia to her house but later in the week he drove his mother's red Pontiac Grand Prix.

¶ 17    Lennie Strader, defendant's cousin, testified that on Monday, October 23, 2017, defendant called him and asked to borrow his truck to move some weights.

¶ 18    On the evening of October 24, 2017, Rose's two sons, Trent and Trai, went to Rose's house, where defendant informed them that he had not seen Rose in two days. Trent and Trai testified that defendant told them Rose went to Peru, Indiana, to buy a car and never returned. Trent and Trai attempted to contact their mother, but she did not answer, so Trent subsequently reported Rose missing to the police. Trent and Trai also testified that friends and family searched for Rose but defendant did not try to help find her.

¶ 19    On October 26, 2017, police interviewed defendant about Rose's disappearance. A video-recorded interview was admitted into evidence and published to the jury without objection. In the interview, defendant said that he last saw Rose around 6 a.m. on Sunday, October 22, 2017. Defendant stated that Rose planned to go to Peru, Indiana, that day to buy a car. He explained they needed separate cars because he was "fighting [his] cases" and needed to be able to "see [his] attorneys." Defendant mentioned he was looking for new counsel because his attorneys were not representing him the way he thought they should. Defendant provided that on Sunday morning he passed out from low blood sugar as Rose was making breakfast and that she was gone when he woke up. He told the police that he last talked to Rose around 10:30 a.m. on Sunday when she texted him that she was heading to get the car. Defendant later left the house in the afternoon, and when he returned around 3 p.m., Rose's Kia was at the house, but she was not there. That night defendant went to his mother's house around 8:30 p.m. and then went and spent the night at Crippin's house. Defendant told the police that he started driving Rose's Kia the next day on Monday. He also described meeting with Trent and Trai two days later, on October 24, 2017, and telling them Rose was missing.

¶ 20    Following the October 26, 2017, interview, the police spoke with defendant's cousin, Nick Patton, which led them to retrieve surveillance videos from two Circle K gas stations and Walmart in Danville. Video surveillance and still photographs of the surveillance videos were submitted into evidence along with testimony from workers at the different establishments. The evidence showed that on October 22,

2017, a little after 5 a.m., a station wagon pulled into a Circle K gas station in Danville and two men got out of the vehicle. A store clerk identified Patton as the man in the blue shirt who went inside the store, while the other man wearing a gray shirt filled a can with gasoline. Approximately 20 minutes later, the same station wagon entered a Walmart parking lot. The vehicle stopped near the front of the store, and the man in the gray shirt, identified as defendant, exited the vehicle and entered the store. Inside the store, defendant purchased a comforter and two rolls of clear plastic before exiting the store. Around 5 p.m., defendant returned to Walmart with another man who purchased a gas can, fuel, and a lighter while defendant exited the store alone.

¶ 21    In addition to the video surveillance, police obtained a warrant and searched Rose's residence and detached garage.

¶ 22    On October 29, 2017, an Illinois State Police crime scene investigator began processing Rose's house. The investigator found the presumptive presence of blood in the master bedroom, living room, kitchen, backyard, and garage. She also identified a stained, partially cut area of carpet in the master bedroom that appeared to have been cleaned. Underneath the cut carpet, the padding was also stained. Inside a drawer in the master bedroom, the investigator found a starter pistol incapable of firing bullets.

¶ 23    The investigator also processed Rose's white Kia, detecting the presumptive presence of blood on the steering wheel and driver-side floorboard and finding plant debris and charred material in the trunk.

¶ 24    On October 29, 2017, police conducted a second interview with defendant at the Danville Public Safety Building. The video-recorded interview was admitted into evidence and published to the jury without objection. In the interview, police first read defendant his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) off a printed sheet of paper. Defendant stated he understood his rights, and when he went to sign the waiver of rights, he stated, "When I normally did this this is when I was being charged or accused of something, so." An officer responded that they were five to six days into their missing person investigation and that they had some things pop up since they last spoke to defendant that they wanted to talk to him about. As defendant signed the waiver of his rights, he said, "[be]cause I do have an attorney."

¶ 25    After defendant waived his *Miranda* rights, officers informed him that Rose's cellular phone remained at her house all day on Sunday, October 22, 2017, and they talked to "somebody" who told them defendant shot Rose at the house. Defendant asserted that the last time he saw Rose was around 6 a.m. on Sunday, October 22, 2017, repeating the story that he passed out from low blood sugar. Defendant denied having any conversations or meeting with Patton on Sunday. Defendant did not remember going to the gas station and filling up a gas can around 5 a.m. on Sunday morning but stated he may have gone to Walmart, although he did not remember. When police pointed out to defendant that he purchased a comforter at Walmart, he confirmed that he needed a new comforter for the bedroom. When police told defendant there was video surveillance showing him at a gas station and at Walmart with Patton early on Sunday morning, defendant stated his low blood sugar caused him not to remember things. Police asked defendant what causes his low blood sugar, and he responded that it is caused by lack of eating and stress. Specifically, he stated his low blood sugar was caused by stress of "fighting three cases" and an incident involving his aunt that caused her to "go a little crazy."

¶ 26    Police asked defendant the last thing he remembered before waking up on Sunday at 6 a.m., and defendant responded that he and Rose never went to sleep and were up all night on Saturday, October 21, 2017, into Sunday morning. Defendant stated his low blood sugar stemmed from diabetes, and he reiterated that he last saw Rose at 6 a.m. on Sunday when she offered to make him breakfast but then he passed out from his low blood sugar. He denied waking up from his low blood sugar episode to discover something happened to Rose. Defendant denied arguing with Rose or being irritable on Saturday night into Sunday.

¶ 27    The officers told defendant that, if something bad happened to Rose, they needed to know so they could give her family closure. Defendant denied anything happened between him and Rose that Saturday night into Sunday morning. The officers then said that Patton was worried that defendant did "something" he did not "mean to do." The officers told defendant they were "past the point" of saying they did not know what happened and that it was "very clear that you caused [Rose's] disappearance." The officers further asked whether Patton "got the right impression [that] this was not something that you wanted to happen." Defendant replied, "No, I said I didn't do anything, period, point blank. And if that's the case,

if you feel like *** based off your [investigation] that I did something, then do what you gotta do, ain't nothing furthermore for us to talk about."

¶ 28        The officers told defendant that they knew Rose did not cook him breakfast at 6 a.m. because "[Rose] wasn't with us anymore at 6 a.m." The officers explained Rose was already in the garage by then and they knew what her car was "used for." The officers stated that they knew what Patton told them but that this was defendant's opportunity to say what happened. When the officers asked him, "is there something you need to get off your chest, is there something you need to tell us," defendant responded, "no, there's not."

¶ 29        The officers mentioned that, when they previously talked to defendant, he said he was "not used to *** talking to the police without being in handcuffs." The officers explained they were just talking to defendant then, "but now it's starting to stack against you." The officers then asked him whether he had any involvement in Rose's disappearance and possible death, and defendant responded, "no I did not." At this point, the officers left defendant alone in the interview room.

¶ 30        A little over an hour later, the officers resumed the interview, and defendant identified still photographs of himself in Patton's vehicle and at Walmart on Sunday, October 22, 2017—including one of him smiling as he left Walmart—but defendant denied the photographs jogged his memory of the events of that morning. Defendant acknowledged he called his cousin, Lennie Strader, and asked to borrow Lennie's truck on Monday, October 23, 2017, but then stated he did not remember exactly when he wanted to borrow Lennie's truck. In response, the officers stated defendant's memory seemed selective. Defendant reverted to his earlier statement about his blood sugar being low around 6 a.m. on October 22, 2017, and Rose offering to make him breakfast. The officers told him that his story had been "debunked" and "proved to be false." They also stated he did not seem like a "monster" or a "cold-hearted killer." Defendant responded, "I'm not a killer at all." The officers informed defendant that the case was starting to build up against him.

¶ 31        Police asked defendant about a missing piece of carpet in the master bedroom of Rose's house, and he explained there were several cut out sections in various places because defendant stashed his cousin's drugs and money under the loose squares of carpet. In response, police asked specifically about a burned area of carpet where the carpet was cut at the end of the bed; defendant said he did that

playing with a lighter and a deodorant can. He denied the cut square of carpet at the end of the bed was presently "soaked with cleaner." Instead, defendant said the wet area was all-purpose purple Listerine he spilled two weeks ago. The officers asked if it was reasonable to believe the Listerine would still be wet after two weeks. Defendant shrugged and stated he did not know.

¶ 32     The officers then stated they had "talked to everybody" and "things are a problem for [defendant] right now." They told him, if he had passed out from low blood sugar, he would have been too sick to do anything that he did that morning. The officers said that Patton's impression was that defendant did something to Rose that was an accident but that defendant's denials did not look good for him. When asked if defendant had anything to say, he shook his head and said, "I told you." The officers continued, stating that defendant's denials "paint[ ] [him] as a cold-hearted person" who "killed a mother in cold blood." Defendant replied, "So you're saying I did something to Barb out of cold blood?" One of the officers replied that it was starting to look that way, yes, to which defendant said, "Like I told you, I ain't did nothing, period, so do what you gotta do." The officers then asked defendant, "Did something happen in the house?" Defendant responded, "No, it did not."

¶ 33     Defendant continued to deny having any knowledge of what happened to Rose. He stated that he did not tell Patton that anything happened between him and Rose. When the officers asked if Patton "fabricated" what he told police, defendant responded, "yes."

¶ 34     The officers told defendant that they needed to know what happened to Rose so they could tell her family what happened to her. Defendant responded, "If I did anything, I would've told you." The officers told defendant that they wanted to believe him, but the evidence was "piling up" against him. When one of the officers said the evidence portrayed defendant as a cold-hearted killer, defendant said, "Everybody got [sic] their opinion about people, whether it's false or whether it's true." Before concluding the interview, the officers asked him if there was anything he wanted to tell them, and he responded "there is not." The officers subsequently ended the interview and left defendant in the interview room alone. Following the interview, while defendant was still sitting in the interview room alone, an officer stepped inside the doorway and asked him for permission to search his phone.

Defendant said, "Yeah, you can search my phone." Defendant remained at the Danville Public Safety Building but was not booked into the county jail until October 31, 2017.

¶ 35 On October 31, 2017, police officers spoke with defendant's mother, Alfreda Luster, at her home. Alfreda told the officers that defendant borrowed her red Pontiac Grand Prix on Saturday, October 28, 2017, and returned it the following day, Sunday, October 29, 2017. Alfreda later testified there was "nothing unusual" in the car when defendant borrowed it. The officers located the vehicle parked in the driveway next door to Alfreda's house, and she gave the officers permission to look inside the vehicle. In the back seat, the officers observed a partially opened black garbage bag, which contained what looked like a comforter and emitted a foul odor. According to Alfreda, she discovered the black plastic bag in the back seat of her red Pontiac Grand Prix on Sunday after defendant returned the car. Alfreda testified she had a bad feeling as soon as she saw the bag. Police obtained a warrant to search Alfreda's red Pontiac Grand Prix.

¶ 36 On November 1, 2017, the crime scene investigator processed Alfreda's red Pontiac Grand Prix. The investigator smelled a foul odor coming from the car mixed with a "detergent-type" smell, like a deodorizer. The investigator located a black plastic bag on the back seat and a sock on the back floorboard. The investigator found a foul-smelling comforter, more bedding, and charred body parts inside the plastic bag. Inside the sock, the investigator discovered a human palate containing teeth wrapped in a shirt. Following these discoveries, the investigator notified the coroner. Subsequently, the crime laboratory identified the remains as Rose's through DNA testing. The crime laboratory also confirmed that defendant's fingerprint was found on the black plastic bag.

¶ 37 On November 2, 2017, Dr. Scott Denton, a forensic pathologist, performed an autopsy on Rose's remains. Dr. Denton opined that Rose died of a gunshot wound to the head and that her body had been burned postmortem. Dr. Denton recovered a bullet from the skull. Dr. Denton noted that Rose's arms were amputated at the forearms and both legs were "traumatically" amputated above the knees. Rose's body had been "extensively charred and burned" to the point of weighing 31 pounds at the time of examination. Toxicology results showed alcohol in Rose's liver.

¶ 38        Following defendant's arrest on October 31, 2017, he was placed in the county jail in a cell next to Carroll Hamilton. Hamilton testified he had two prior convictions going back to the 1990s for burglary, theft, and deceptive practices. At the time of defendant's trial, Hamilton was facing charges for criminal damage to property, criminal trespass, his involvement in someone committing an auto burglary, and his involvement in somebody using a stolen credit card. Hamilton admitted he previously sought to trade information with authorities in exchange for leniency in his cases.

¶ 39        Hamilton testified that he knew defendant prior to being housed in the cell next to him in October 2017. Specifically, Hamilton met defendant several years earlier, and in February 2017, he lived with Rose and defendant at Rose's residence for nine days after being paroled. Hamilton stated he heard about Rose's disappearance on the news and that one night, while in the cell next to him, defendant told Hamilton about the circumstance surrounding Rose's death.

¶ 40        According to Hamilton, defendant told him that he and Rose "were joking around" when Rose "pulled a pistol" on him that he knew was a fake "starter pistol." In response, defendant "pulled" a .22-caliber revolver on Rose. Defendant then heard the starter pistol fire, and he saw blood under Rose's eye on the right side of her face before her eyes went blank. Defendant grabbed Rose and could hear a heartbeat but did not call 911. Instead, defendant held Rose for 30 minutes until he didn't hear her heartbeat anymore. Defendant then called Patton for help moving Rose's body out of the house and into the garage. Patton and defendant wrapped Rose's body in a comforter before they left and went to "several" gas stations, where they filled gas cans, and to Walmart to buy "plastic." After returning to the house, Patton left, and defendant was in contact with several other people that day. Defendant then told Hamilton that he later moved Rose's body via the car to a secluded area near an abandoned house and set it on fire using gasoline. Either the next night or the night after, defendant went back to the burn site. Defendant discovered rain had put the fire out, and animals had been eating Rose's body, so defendant cut Rose's hands, feet, and jawbone into "smaller pieces and bag[ged] [her] up." Defendant then "stored" the body parts in the back of his mother's car.

¶ 41        Hamilton testified he wrote down "word for word" what defendant told him, hoping to gain leniency from the authorities in exchange for the information.

Hamilton sent a copy of his notes to the police, who spoke with Hamilton on November 7, 2017. After speaking with police, Hamilton was granted a "medical recognizance." Hamilton then led police to the burn site near 1519 Lyons Street, using the description defendant gave him. Hamilton testified that, in exchange for his cooperation, prosecutors agreed to a deal in which he received a three-year sentence on a burglary charge that would have otherwise subjected him to a sentencing range of 6 to 30 years' imprisonment.

¶ 42     On November 8, 2017, another crime scene investigator processed a "burn site" at an abandoned house near 1519 Lyons Street in Danville that smelled of gasoline, and the crime laboratory later confirmed the substance was gasoline. At the burn site, the investigator found melted plastic, carpet, burned rubber, and burned pieces of bone. On November 14, 2017, Dr. Denton received materials from the burn site that were identified as being associated with Rose's body. Dr. Denton examined those materials and opined that the bone fragments from the burn site were human and consistent with body parts that were missing from the remains found in defendant's mother's car.

¶ 43     Following the presentation of evidence, the jury found defendant guilty of first degree murder where during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused Rose's death. The jury also found defendant guilty of three counts of concealment of a homicidal death for moving Rose's body (1) from the bedroom, (2) to 1519 Lyons Street (the burn site), and (3) to a Pontiac Grand Prix. In addition, the jury found defendant guilty of two counts of dismembering a human body: (1) "mutilation by fire" and (2) "dismember/sever/separate."

¶ 44                              C. Defendant's Posttrial Motions and Sentences

¶ 45     On August 25, 2021, defendant filed a posttrial motion for a new trial, arguing (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred by not barring the informant testimony of Hamilton, (3) the court erred by allowing fingerprint testimony where the fingerprint expert did not identify the exact location of the fingerprint on the plastic bag and the State failed to present a proper chain of custody, (4) the surveillance videos from two gas stations and Walmart should have been excluded where the State did not lay a proper foundation

for them, and (5) a crime scene investigator's testimony as it related to "Luminol" should have been excluded.

¶ 46       On September 2, 2021, the trial court held a sentencing hearing. Before sentencing defendant, the court addressed a *pro se* motion claiming ineffective assistance of counsel filed by defendant and defendant's motion for a new trial. In denying defendant's *pro se* motion for ineffective assistance, the court found defendant's claims "lack merit and wholly pertain only to matters of trial strategy, and therefore, the *Krankel* proceeding will not go any further than this first step, and I've made my findings accordingly." See *People v. Krankel*, 102 Ill. 2d 181 (1984). The court also denied defendant's motion for a new trial.

¶ 47       Following the denial of the posttrial motions, the court proceeded to sentencing. Both parties discussed whether the separate convictions for concealment and dismemberment should be merged into a single concealment conviction and a single dismemberment conviction addressing whether they took place as part of the same course of conduct. The court ultimately sentenced defendant to consecutive sentences of 60 years in prison for first degree murder, 15 years in prison for each dismemberment conviction, and 2 years in prison for each concealment conviction.

¶ 48       On September 22, 2021, defendant filed a motion to reconsider his sentence. Defendant argued the trial court erred by failing to merge the dismemberment and concealment convictions instead of making a finding of conviction on each count and sentencing defendant consecutively on each count. Following an October 19, 2021, hearing, the court denied the motion. The cases were consolidated for appeal.

¶ 49                         D. Appellate Court Proceedings

¶ 50       On appeal, defendant argued (1) his conviction for first degree murder must be reversed or reduced to involuntary manslaughter because the evidence failed to prove he intentionally or knowingly killed Rose; (2) his trial counsel was ineffective for failing to move to suppress, redact, or object to "inadmissible and inflammatory" evidence; (3) the convictions based on the 2019 indictments must be vacated because those charges violated his right to a speedy trial; and (4) one conviction for dismembering a human body and two convictions for concealment

of a homicidal death must be vacated because the legislature did not permit multiple convictions under the relevant statutes. 2023 IL App (4th) 210630, ¶ 47.

¶ 51 The Fourth District affirmed the trial court's judgment, (1) holding that any rational trier of fact could have found the elements of intentional or knowing murder beyond a reasonable doubt and (2) rejecting defendant's contention that it should reduce his conviction to involuntary manslaughter. *Id.* ¶ 56. As to the ineffective assistance of trial counsel claims, the court held that defense counsel did not render ineffective assistance in failing to file a motion to suppress the October 26 and 29, 2017, video-recorded interviews in whole or in part. *Id.* ¶ 78. The court also rejected defendant's claims that counsel was ineffective for (1) failing to move to redact portions of the October 26 and 29, 2017, video-recorded interviews, (2) failing to object to statements made by the prosecution during closing argument, and (3) not requesting limiting instructions as to how the jury should consider the officers' statements during the interviews. *Id.* ¶¶ 70-71, 74-76. The court noted that defendant conceded no Illinois courts have addressed the need for such instructions. *Id.* ¶ 74. The court determined that even if defense counsel's performance were deficient, defendant could not establish prejudice where the direct and circumstantial evidence of his guilt was overwhelming. *Id.* ¶¶ 77-78. The court also rejected his speedy trial claim. *Id.* ¶ 112. Finally, the court held that defendant was properly convicted of multiple counts of dismemberment and concealment where each legally distinct offense was sufficiently charged by alleging separate dates and discrete acts. *Id.* ¶¶ 122, 126. The court determined "the evidence at trial amply supported the convictions on each count." *Id.* ¶ 126.

¶ 52 We allowed defendant's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Oct. 1, 2021). We also allowed the Exoneration Project leave to file an *amicus* brief in support of defendant's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 53                                    II. ANALYSIS

¶ 54 In this appeal, defendant argues (1) his trial counsel provided ineffective assistance and (2) this court should vacate one of his dismemberment convictions and two of his concealment convictions. We review each issue in turn.

- 14 -

¶ 55                          A. Ineffective Assistance of Counsel

¶ 56        Defendant argues his trial counsel was ineffective for failing to (1) seek suppression of a portion of defendant's second video-recorded police interview following the invocation of his right to silence, (2) seek to redact inadmissible statements made by police and suggestions of other crimes made by defendant during the video-recorded interviews, and (3) request a limiting instruction concerning the inadmissible statements. The State argues defendant cannot show that trial counsel's performance fell below an objective standard of reasonableness or that he was prejudiced by counsel's performance.

¶ 57        We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which this court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984). To succeed on a claim of ineffective assistance of counsel, defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. "A defendant must satisfy both prongs of the *Strickland* test[,] and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 58        "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38 (2000). Prejudice results when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 59        Here, we need not reach the question of whether trial counsel's performance was deficient for failing to seek suppression, redaction, or the limitation of the jury's consideration of portions of the video-recorded police interviews. Critically, we find defendant is unable to establish he suffered any prejudice from counsel's alleged failures. In this case, the evidence of defendant's guilt is overwhelming. Thus, there is no reasonable probability that, but for counsel's claimed errors, the outcome of his trial would have been different. Even if both the video-recorded police interviews were excluded, it would not have changed the outcome at trial, as the remaining direct and circumstantial evidence presented was more than sufficient to establish defendant's guilt.

¶ 60    The circumstantial evidence at trial showed a timeline of events that took place starting on Saturday, October 21, 2017, and continuing after defendant's October 31, 2017, arrest. Defendant explained to Rose's sons, Trent and Trai, that he last saw Rose on Sunday, October 22, when Rose went to Peru, Indiana, to buy a car and never returned. However, Veatch testified that she talked to Rose on Saturday, October 21, and the two women planned to meet up the next day with Rose never mentioning going to Indiana to buy a car. Veatch texted Rose the next day around noon, but Rose never responded.

¶ 61    Bryant saw Rose on Sunday, October 22, around 3 a.m. when she dropped off her daughter at Rose's house for Rose to babysit, but later that day around 11 a.m., defendant, not Rose, contacted Bryant and asked her to come pick up her daughter. Around 11:30 a.m., Harrier went to pick up Bryant's daughter at Rose's house, but defendant handed Harrier the baby through the open door without welcoming her inside, telling her of the "vicious" dog. Harrier testified she was familiar with Rose's dog and never knew it to be vicious. Further, Bryant testified that Rose previously watched her children and never left them alone with defendant.

¶ 62    Also, on the morning of Sunday, October 22, around 5 a.m., video surveillance showed defendant with Patton at a gas station in Danville, filling up a gas can. Approximately 20 minutes later, video surveillance placed defendant at Walmart in Danville, where he purchased a comforter and two rolls of clear plastic before exiting the store. Later on Sunday, around 5 p.m., defendant returned to Walmart, where video surveillance showed he entered the store with another man who purchased a gas can, fuel, and a lighter.

¶ 63    Defendant spent Sunday night and all but one night the week following with Crippin. On the one night defendant did not stay with her, he asked her for a lighter. Crippin testified she asked defendant why he needed a lighter because he did not smoke, and he told her a friend needed it.

¶ 64    The next day, on Monday, October 23, 2017, defendant asked Lennie if he could borrow his truck, but Lennie refused. It was not until Tuesday, October 24, 2017, that defendant told Trent and Trai that Rose was missing. Defendant then spoke with police on October 26, 2017. However, both Trent and Trai testified that, in the days following, defendant did not help friends and family search for Rose.

¶ 65        Instead, on Saturday, October 28, 2017, defendant borrowed his mother's red Pontiac Grand Prix and returned it the following day, Sunday, October 29, 2017. Alfreda testified there was "nothing unusual" in the car when defendant borrowed it but that, when he returned it on Sunday, she discovered a black plastic bag in the back seat. A crime scene investigator processed Alfreda's red Pontiac Grand Prix and discovered the black plastic bag in the back seat and a sock on the back floorboard. The investigator found a foul-smelling comforter, more bedding, and charred body parts inside the plastic bag and a human palate containing teeth wrapped in a shirt in the sock. The crime laboratory identified these remains as Rose's through DNA testing, and defendant's fingerprint was found on the plastic bag containing Rose's remains wrapped in a comforter. A forensic pathologist performed an autopsy on Rose's remains and determined that she died of a gunshot wound to the head and her body had been burned postmortem.

¶ 66        Crippin testified that initially defendant drove a white Kia to her house following Rose's disappearance but later in the week he drove his mother's red Pontiac Grand Prix. The crime scene investigator also processed Rose's white Kia in addition to her house and detached garage. The investigator found the presumptive presence of blood on the steering wheel and driver-side floorboard of the Kia as well as charred material in the trunk.

¶ 67        At Rose's house, the investigator also found the presumptive presence of blood in the master bedroom, living room, kitchen, backyard, and detached garage. The investigator further found a starter pistol incapable of firing bullets in the master bedroom and identified a stained, partially cut area of carpet in the master bedroom that appeared to have been cleaned. The investigator discovered the padding underneath the cut carpet was also stained.

¶ 68        An investigator also processed a "burn site" near 1519 Lyons Street in Danville and discovered gasoline and burned pieces of bone later determined to be associated with Rose's body.

¶ 69        The direct evidence presented at trial consisted of defendant's admissions to Hamilton that he shot Rose in the head, burned and dismembered her body, and "stored" the body parts in the back of his mother's car. Hamilton later directed police to the burn site near 1519 Lyons Street.

¶ 70    In reviewing the evidence, we find that the direct evidence was not only supported by the timeline of events produced through the circumstantial evidence, but it was also corroborated by the physical evidence. Independently and taken together, the direct and circumstantial evidence overwhelmingly establish defendant's guilt. Accordingly, because we find that there is no reasonable probability that, but for counsel's failure to seek to suppress evidence, redact statements, or limit the jury's consideration of portions of the video-recorded police interviews, the guilty verdicts would have been different, defendant's ineffective assistance of counsel claims fail.

¶ 71    We next turn to defendant's claim that multiple convictions for dismembering a human body and concealing a homicidal death are improper because they arise from the dismemberment of one body and the concealment of one death.

¶ 72                    B. Multiple Dismemberment and
                        Concealment Convictions

¶ 73    Defendant argues this court should vacate one of his dismemberment convictions and two of his concealment convictions because the plain language of the concealment of a homicidal death and dismemberment statutes authorizes only one conviction for concealing the same death and one conviction for dismembering the same body.

¶ 74    The State argues we should reject defendant's claim that his multiple convictions for dismembering a human body and concealing a homicidal death are improper because they arise from the dismemberment of one body and the concealment of one death. Instead, the State contends that we should hold that each statute authorizes multiple convictions when a defendant violates the statute more than once through separate and discrete courses of conduct. The State asserts, because the evidence established that defendant dismembered Rose's body and concealed her death through a series of actions that constituted two courses of conduct, we should affirm his two dismemberment convictions and two of his concealment convictions. The State concedes that we should vacate the concealment conviction that was based on defendant's movement of Rose's body from the bedroom to the garage because his acts of moving the body to the garage

and to the burn site are best categorized as a single course of conduct, given the similarity of conduct, proximity of time, and absence of an intervening event.

¶ 75    We accept the State's concession and vacate the concealment conviction in Vermilion County case No. 17-CF-725 that was based on defendant moving Rose's body from the bedroom to the garage. Therefore, our review is limited to the remaining two counts of concealment and two counts of dismemberment.

¶ 76    To resolve defendant's contention that the plain language of the concealment of a homicidal death and dismemberment statutes authorizes only one conviction for concealing the same death and one conviction for dismembering the same body, we look to the language of the concealment and dismemberment statutes to determine whether the legislature established the unit of prosecution. Determining the unit of prosecution is a question of statutory interpretation subject to *de novo* review. *People v. Torres*, 2024 IL 129289, ¶ 31; *People v. Hartfield*, 2022 IL 126729, ¶ 68.

¶ 77    The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning. *Torres*, 2024 IL 129289, ¶ 31; *Hartfield*, 2022 IL 126729, ¶ 68. When looking at the statute, it "must be viewed as a whole, and as such, this court construes words and phrases not in isolation but relative to other pertinent statutory provisions." *Hartfield*, 2022 IL 126729, ¶ 68. Criminal or penal statutes must be strictly construed in favor of the accused, and "nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute." *People v. Davis*, 199 Ill. 2d 130, 135 (2002).

¶ 78    Pertinently, we look to "the language of the statute to determine what precisely has been prohibited by the legislature and in what unit of time, actions, or instances that crime is committed once." *Hartfield*, 2022 IL 126729, ¶ 83. Specifically, "[t]he unit of prosecution of an offense refers to what act or course of conduct the legislature has prohibited for purposes of a single conviction and sentence." *Id.* ¶ 67. The unit of prosecution is "aimed at determining how many times the same offense has been committed in a particular course of conduct." *Id.* ¶ 73.

¶ 79    As it relates to the unit of prosecution, "[t]his court has followed the lead of the United States Supreme Court in applying the doctrine of lenity where the unit of

- 19 -

prosecution is unclear." *Id.* ¶ 69 (citing *Bell v. United States*, 349 U.S. 81 (1955)). Where there is ambiguity in a statute, the doctrine of lenity works to resolve the ambiguity in the defendant's favor. *Id.* In such situations, "doubt will be resolved against construing the statute as supporting multiple instances of the same offense based on the exact same act." *Id.* ¶ 83. In sum, in this matter we decide how many times the offenses of concealment of a homicidal death and dismembering a human body were committed. See *id.* ¶ 73.

¶ 80                                   1. *Concealment of a Homicidal Death*

¶ 81        A jury convicted defendant on two counts of concealment of a homicidal death where on or about (1) October 23 to 26, 2017, he knowingly concealed the death of Rose by moving her body to the property near 1519 Lyons Street, Danville, Illinois, with knowledge that Rose died by homicidal means and (2) October 27 to 29, 2017, he knowingly concealed the death of Rose by placing her body parts in a sock and bag and placed them in a 2000 Pontiac Grand Prix, with knowledge that Rose had died by homicidal means.

¶ 82        "A person commits the offense of concealment of homicidal death when he or she knowingly conceals the death of any other person with knowledge that such other person has died by homicidal means." 720 ILCS 5/9-3.4(a) (West 2016). "Conceal" is defined as "the performing of some act or acts for the purpose of preventing or delaying the discovery of a death by homicidal means." *Id.* § 9-3.4(b-5).

¶ 83        Defendant argues that, when looking at the plain language, the legislature's use of the phrase "some act or acts" in relation to the remaining statutory language confirms that a single offense of concealment can include multiple acts as it relates to "a" homicidal death.

¶ 84        We agree with defendant and find the language in the concealment statute unambiguous as to the unit of prosecution. The unit of prosecution analysis is controlled by what the statute seeks to prohibit (*Hartfield*, 2022 IL 126729, ¶ 77), and it is clear that the concealment statute seeks to prohibit a defendant from performing "some act or acts" to conceal a homicidal death.

¶ 85        While the State seems to agree that the unit of prosecution in the concealment statute is clear that a defendant cannot be convicted of separate offenses of concealment based on a series of acts committed as part of the same course of conduct, it goes a step further and asserts that "a single unit of prosecution does not immunize a defendant from being punished separately for successive commissions of the same offense." See *Friend v. People*, 2018 CO 90, ¶ 21. The State appears to interpret "successive commissions" as different courses of conduct. The State contends that the evidence in this case established that defendant successively violated the concealment statute through two discrete courses of conduct, making multiple convictions proper.

¶ 86        The State argues this court in *People v. Sienkiewicz*, 208 Ill. 2d 1, 7-8 (2003), analyzed whether charges brought under multiple statutes arose from a single course of conduct by employing a multifactor test. The State suggests the same multifactor test is relevant to determine whether multiple charges under a single statute arise from one or more courses of conduct, as the question in both instances involves an assessment of how best to group a series of potentially related acts. The State asserts that we should employ such a multifactor test to establish that defendant's series of acts of concealment violated the concealment statute through two discrete courses of conduct.

¶ 87        Defendant argues the *Sienkiewicz* factors are "relevant to an analysis of whether there are one or more acts" underlying different charges, not to determine course of conduct. See *id.* at 7. We agree with defendant. The multifactor test in *Sienkiewicz* does not define what constitutes a particular course of conduct, and it is clear in this case that defendant committed more than one act in the underlying charges of concealment.

¶ 88        In determining what constitutes a particular course of conduct, defendant cites *People v. Bell*, 196 Ill. 2d 343 (2001). This court in *Bell* looked to whether multiple offenses arose from an " 'unrelated course of conduct' " to determine eligibility for extended-term sentencing. *Id.* at 354-55. While *Bell* deals with a different issue than the one before this court, we find *Bell* instructive.

¶ 89        In *Bell*, this court held that, "in determining whether a defendant's multiple offenses are part of an 'unrelated course of conduct' for the purpose of his eligibility for an extended-term sentence under section 5-8-2(a), courts must consider whether

there was a substantial change in the nature of the defendant's criminal objective." *Id.* at 354. The court determined, "[i]f there was a substantial change in the nature of the criminal objective, the defendant's offenses are part of an 'unrelated course of conduct' and an extended-term sentence may be imposed on differing class offenses." *Id.* at 354-55. However, if "there was no substantial change in the nature of the criminal objective, the defendant's offenses are not part of an unrelated course of conduct, and an extended-term sentence may be imposed only on those offenses within the most serious class." *Id.* at 355.

¶ 90 We find, based on the guidance of *Bell*, where there is no substantial change in the nature of the criminal objective, the defendant's acts are part of the same course of conduct. Such a finding is consistent with the plain language of the concealment statute.

¶ 91 Here, defendant's acts of moving Rose's body to the burn site and then placing her body parts in a sock and bag in the back of his mother's car were all part of the same course of conduct to conceal Rose's homicidal death. Thus, defendant did not successively violate the concealment statute through two discrete courses of conduct. Defendant's criminal objective never changed. Defendant's actions were intended to prevent or delay the discovery of Rose's homicidal death. Accordingly, we find defendant was improperly convicted of more than one count of concealment of a homicidal death. We therefore vacate an additional concealment conviction, leaving only one concealment conviction.

¶ 92 We next look at the language of the dismemberment statute to determine whether the legislature established the unit of prosecution and if defendant's conviction violated that statute.

¶ 93 2. *Dismembering a Human Body*

¶ 94 A jury convicted defendant on two counts of dismembering a human body where on or about (1) October 23 to 26, 2017, defendant knowingly mutilated the deceased body of Rose by use of fire and (2) October 27 to 29, 2017, defendant knowingly dismembered, severed, and separated body parts from the deceased body of Rose.

- 22 -

¶ 95        "A person commits dismembering a human body when he or she knowingly dismembers, severs, separates, dissects, or mutilates any body part of a deceased's body." 720 ILCS 5/12-20.5(a) (West 2016).

¶ 96        Defendant argues that the dismemberment statute does not reveal a clear intent to separately penalize multiple acts of dismembering the same human body and thus lenity requires the statute be construed in his favor.

¶ 97        The State argues that neither the plain language of the dismemberment statute nor general principles of criminal law support defendant's contention that the statute permits only one conviction for "multiple acts of dismemberment of the same body." The State asserts that, while the language of the dismemberment statute can be broadly construed to authorize a separate conviction for each "part of a deceased's body" that a defendant "dismembers, severs, separates, dissects, or mutilates," it agrees that a series of such acts committed as a single course of conduct cannot give rise to multiple convictions under the statute. The State however contends, like it did under the concealment statute, that the evidence here established that defendant dismembered Rose's body through a series of actions that constituted two courses of conduct.

¶ 98        Defendant argues the dismemberment statute does not have any language to support the State's argument that multiple courses of conduct support multiple offenses. But even if it did, setting fire to Rose's deceased body and severing her body parts were part of the same course of conduct because his objective never changed where he took those actions "to evade detection and capture for the murder" of Rose.

¶ 99        When looking at the plain language of the dismemberment statute, we find that the unit of prosecution is ambiguous. Specifically, the language is ambiguous as to whether multiple acts of dismemberment or a single act of dismemberment occurs when a defendant repeatedly "dismembers, severs, separates, dissects, or mutilates" "any body part of a deceased's body." Absent in the statute is any language definitively outlining whether each act of dismemberment to the same body constitutes a criminal offense. Thus, we apply the doctrine of lenity in defendant's favor. See *Hartfield*, 2022 IL 126729, ¶ 69. Accordingly, in such a situation, a statutory provision imposes a single conviction for a single act or particular course

- 23 -

of conduct unless multiple convictions are unambiguously commanded by the legislature. See *id.*

¶ 100   Defendant argues setting fire to Rose's deceased body and severing her body parts were part of the same course of conduct because his objective never changed where he took those actions "to evade detection and capture for the murder" of Rose. The State argues defendant dismembered Rose's body through a series of actions that constituted two courses of conduct.

¶ 101   As stated above, where there is not a substantial change in the nature of the criminal objective, the defendant's acts are part of the same course of conduct. See *Bell*, 196 Ill. 2d at 354-55. Accordingly, we find defendant's acts of setting fire to Rose's deceased body and severing her body parts were part of the same course of conduct. Defendant's objective never changed where his actions were intended to hide or get rid of the evidence of Rose's murder. Thus, defendant was improperly convicted of more than one count of dismembering a human body. We therefore vacate one of defendant's dismemberment convictions, leaving only one dismemberment conviction.

¶ 102                                III. CONCLUSION

¶ 103   For the foregoing reasons, we find that defendant's trial counsel did not provide ineffective assistance of counsel, as defendant cannot establish prejudice. Accordingly, we affirm defendant's conviction and sentence for first degree murder. As to defendant's convictions for concealment and dismemberment, we hold that defendant was improperly convicted of multiple counts of dismemberment and concealment. Accordingly, we reverse the lower courts' judgments and vacate one of defendant's convictions for dismembering a human body and two of defendant's convictions for concealment of a homicidal death.

¶ 104   Judgments affirmed in part, reversed in part, and vacated in part.